Louis A. **MITCHELL**, Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent–Appellee.

No. 94–1966.

United States Court of Appeals, Sixth Circuit.

Decided Jan. 16, 1996.

Before: SILER and DAUGHTREY, Circuit Judges; ROSEN, District Judge.[*]

ROSEN, District Judge.

Petitioner/Appellant Louis A. Mitchell appeals a decision of the United States Tax Court disallowing a deduction of $755,172 which Mitchell had claimed as a business expense on his federal income tax return. This amount was a "restitution" payment made by Mitchell in order to keep stocks which he had obtained in violation of federal banking regulations. The IRS disallowed the claimed deduction finding that the amount paid was not deductible as an ordinary and necessary business expense. The tax court ruled in favor of the IRS, holding that the $755,172 was a capital expenditure necessary to retain ownership of the stock which had to be capitalized into the basis of the stock. For the reasons stated herein, we affirm.

## I. *STATEMENT OF FACTS*

During 1987 and 1988, Petitioner Louis A. Mitchell served as the Chairman of the Board of Directors and Chief Executive Officer of County Savings Bank, a thrift savings and loan association in Columbus, Ohio. County Savings Bank was a wholly-owned subsidiary of First Financial Group, Inc. ("FFG"). Mr. Mitchell was also Chairman of the Board of FFG and that institution's majority stockholder, holding approximately 95% of the corporation's stock. In his capacity as an officer and director of County Savings and FFG, Mitchell had oversight responsibility for the Bank's and FFG's Investment Committees.

In 1987, County Savings Bank realized substantial capital gains from various securities transactions. In order to minimize the Bank's anticipated tax liability on its capital

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

gains, the Investment Committee decided to sell its stock in Home and City Savings Bank. The Home and City stock was selected for sale because County Savings Bank's stock in Home and City represented the single largest unrealized capital loss in County's investment portfolio, totaling $2,079,670, and could be used to offset County Saving Bank's capital gains.

Mitchell apparently decided that he wanted to personally purchase the shares of Home and City which County Savings had decided to sell. Home and City was a publicly traded stock on the over-the-counter market; however, Mitchell wanted to purchase the stock through a private sale [1].

Mitchell consulted with Kenneth Cooke of Price Waterhouse, who was County Savings' accountant. Mr. Cooke advised petitioner, that if he were to buy the stock through a private sale it would constitute a sale to a "related party", which would preclude the Bank from recognizing any resulting tax loss. Thus, the reason for the sale would be undermined.

Notwithstanding Cooke's advice, Mitchell decided on his own that the "related party" consequences could be avoided through a "strawman" transfer. Mitchell provided the funds for the purchase of the stock to two of the Bank's vice-presidents, Benson Scott Beaver and Charles W. Claggett, III, and had them buy the desired stock for him.

In December 1987, Beaver and Claggett purchased 286,400 shares of Home and City stock owned by Bank through a private sale conducted by Dean Witter at the price of $13 per share. In accordance with their agreement with Mitchell, Beaver and Claggett then transferred 269,400 shares of the stock to Mitchell in January 1988. Pursuant to options granted to them by Mitchell, Beaver and Claggett each retained 5,000 shares and the remaining 7,000 shares were sold to various officers of the Bank for $13 per share.

At the time of the January 1988 transfer of the shares, the market price of the stock was $16 per share.

Subsequent to the sale, as part of County Savings' annual year-end audit, the Bank's Price Waterhouse accountants informed Mitchell that the structured sale of the Home and City stock still precluded the Bank from deducting the now-realized loss. Mitchell was further advised that the private sale violated 12 C.F.R. § 563.41 of the Federal Home Loan Bank Board ("FHLBB") regulations, which provides that a sale to an affiliated party may be done only with the express, written permission and authority of the Principal Supervisory Agent of the FHLBB.[2] The sale of the Home and City stock to the Bank's vice-presidents was made without the requisite permission. As a result, County Savings was prohibited from deducting the loss against its capital gains, effectively costing it a tax deduction of $755,172.

Upon being advised by the accountants of the failure to comply with the requirements of § 563.41 and the consequences, Mitchell informed the FHLBB Supervisory Agent, Kurt Kreinbring, of the regulatory violation. Mr. Kreinbring told Mitchell that, as Chairman and CEO, and as primary purchaser of the stock, he had two options: He could either void the entire sale and return the Home and City stock to County Savings, or pay the Bank $755,172, the value of the Bank's lost tax benefit.

By this time, the market value of Home and City's stock had appreciated substantially and Mitchell's equity interest in the stock correspondingly increased to approximately $3.3 million. Not surprisingly, Mitchell decided to pay the $755,172 as restitution for the loss sustained by the Bank and keep the stock.

Mitchell included the $755,172 in his 1988 income tax return as a Schedule C loss in-

---

**1.** Mitchell's reasoning for a "private purchase" rather than an over-the-counter transaction was that he did not want to artificially depress the value of the stock.

**2.** 12 C.F.R. § 563.41 provides:
  (b) Restrictions. No insured institution or subsidiary thereof may, directly or indirectly, pur-

chase …, sell or lease to, an affiliated person of the institution any interest in real or personal property unless the transaction is determined by the Principal Supervisory Agent to be fair to, and in the best interest of, the insured institution or subsidiary.

curred in connection with a trade or business and, thereby, attempted to deduct it under 26 U.S.C. § 162[3]. The Internal Revenue Service disallowed this deduction, and on June 22, 1992 sent a notice of deficiency to Mitchell informing him that the $755,172 was a non-deductible capital expenditure. Mitchell filed a timely petition seeking redetermination of the deficiency with the United States Tax Court. A trial was held on February 14, 1994. The Tax Court determined that the $755,172 payment stemmed from the violation of 12 C.F.R. § 563.41 and was done to protect Mitchell's right to retain the stock. As such, the Tax Court ruled that the restitution payment was a capital expenditure, and not a viable business deduction. Accordingly, the court ruled that the $755,172 payment had to be capitalized into the basis of the stock purchased by Mitchell.[4]

## II. DISCUSSION

### A. STANDARD OF REVIEW

■ This matter presents for appellate review the propriety of an I.R.C. § 162 deduction. The facts are uncontroverted, and the only question presented in this appeal is whether the law as applied to the facts fulfills the statutory requirement. As such, the appropriate standard is *de novo* review. *Pollei v. Commissioner*, 877 F.2d 838, 839 (10th Cir.1989); *O'Neill v. Commissioner*, 994 F.2d 302, 304 (6th Cir.1993).

### B. THE TAX COURT CORRECTLY DETERMINED THAT THE RESTITUTION PAID BY PETITIONER TO THE BANK CONSTITUTED A CAPITAL EXPENDITURE, NOT AN ORDINARY AND NECESSARY BUSINESS EXPENSE.

The issue in this case is the application of 26 U.S.C. § 162(a) of the Internal Revenue Code as it applies to "ordinary and necessary business expenses", versus 26 U.S.C § 263 and the definition of a "capital expenditure".[5]

Under 26 U.S.C. § 162(a), deductions are allowed for, "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Capital expenditures under § 263, however, are not deductible in the year of the expenditure, but rather must be capitalized into the basis of the capital asset and amortized over the asset's useful life.

■ Under 26 U.S.C. § 162, voluntary expenditures incurred by a taxpayer may qualify as ordinary and necessary business expenses if such payments are made to prevent injury to the taxpayer's business reputation. *Gould v. Commissioner*, 64 T.C. 132, 135, 1975 WL 3011 (1975). Yet, regardless of purpose, an expense is not deductible if it is used for the acquisition of a capital asset. *Barrett v. Commissioner*, 96 T.C. 713, 722–24, 1991 WL 80644 (1991); *Bradford v. Commissioner*, 70 T.C. 584, 1978 WL 3325 (1978); *Wagner v. Commissioner*, 78 T.C. 910, 1982 WL 11101 (1982); *Mitchell v. Commissioner*, 428 F.2d 259 (6th Cir.1970), reversing and remanding 52 T.C. 170, 1969 WL 1668 (1969), *cert. denied*, 401 U.S. 909, 91 S.Ct. 868, 27 L.Ed.2d 807 (1971).

■ It is well established that, "[s]ince the inception of the present federal income tax in 1913, capital expenditures have not been deductible." *Woodward v. Commissioner*, 397 U.S. 572, 574, 90 S.Ct. 1302, 1304, 25 L.Ed.2d 577 (1970). Furthermore, "[i]t has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures." *Id.* at 575, 90 S.Ct. at 1305.

---

**3.** 26 U.S.C. § 162 provides:

> There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. . . .

**4.** The IRS also had fined Mitchell $53,873 for substantially understating his tax liability pursuant to I.R.C. § 6661. The Tax Court decided that Mitchell had sufficiently complied with § 6661

and therefore reversed the penalty assessment. This issue has not been raised on appeal by either party.

**5.** 26 U.S.C. § 263 defines capital expenditures as,

> "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."

Treasury Regulation § 1.263(a)–2(a) defines a capital expenditure as, "the cost of acquisition . . . of . . . property having a useful life substantially beyond the taxable year." The Supreme Court has also held that where a payment results in the acquisition or retention of a capital asset, the expenditure is considered capital. *Godfrey v. Commissioner*, 335 F.2d 82, 85 (6th Cir. 1964), *cert. denied*, 379 U.S. 966, 85 S.Ct. 660, 13 L.Ed.2d 560 (1965). *See also, Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988) (holding that a taxpayer's motivation in purchasing an asset is irrelevant; the only question is whether the asset is "property held by a taxpayer (whether or not connected with his business)." *Id.* at 223, 108 S.Ct. at 978).

The foregoing authorities make clear that the Home and City stock at issue in this case must be considered a capital asset. The issue, therefore, is how to characterize Mitchell's restitution payment of $755,172 to the Bank, which he attempted to deduct as a business expense on his personal income tax return.

In order to determine the characterization of settlement payments, the Supreme Court has established the "origin-of-claim" test. Under this test, characterization of an expense as "personal" or "business",

> depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's income-producing property. . . .

*United States v. Gilmore*, 372 U.S. 39, 48, 83 S.Ct. 623, 629, 9 L.Ed.2d 570 (1963).

Mitchell argued in the Tax Court, as he does in this appeal, that the origin of the claim was his decision as C.E.O. and Director of County Savings Bank, to sell the stock to reduce County Savings' tax liability. The Tax Court disagreed and found that the origin of the claim was Petitioner's personal acquisition of the stock.

A similar scenario was addressed by the Tax Court in *Bradford v. Commissioner*, 70 T.C. 584, 1978 WL 3325 (1978). In *Bradford*, the petitioners were stock brokers who, due to insider trading, were required by the SEC to pay approximately $100,000 into an escrow account. The money in the escrow account was used to fund restitution payments to persons who were harmed by the petitioners' insider trading. The petitioners subsequently claimed an "ordinary-and-necessary-business-expense" deduction on their income tax for the amounts they contributed to the escrow account. They argued, as Mitchell argues here, that the origin of the claim was their dealings as broker-dealers and that the settlement payment was to protect the reputation of their business. The court disagreed, holding that the settlement arose in connection with the petitioners' purchase of stock. *Id.* at 594. The tax court based it decision on the fact that the SEC sought not only injunctive relief, but also sought to, "disgorge the profits arising out of their inside trading activities for their personal accounts." *Id.*

The instant case is similar to *Bradford* in many respects. As in *Bradford*, Mitchell violated federal regulations in order to procure a capital asset, namely Home and City stock. Furthermore, due to the violation of the regulation, Mitchell was required to pay restitution to the party which was harmed by the violation, in this case the Bank which had lost the value of the capital loss which had been intended to offset a capital gain. Finally, as did Bradford, Mitchell asserts that the origin of the claim lies in his professional actions as opposed to his personal objectives.

Petitioner tries to distinguish *Bradford* by stating that he was not required to "disgorge the profits realized from his actions." This argument misses the point because, irrespective of the nature of the funds he was required to repay, the primary focus of the restitution payment was to make whole the injured party, County Savings Bank.

Mitchell also argues that the violation 12 C.F.R. § 563.41 should be deemed to be the origin of the claim, not his subsequent acquisition of the stock. As noted above, 12 C.F.R. § 563.41 prohibits transactions between banking institutions and "affiliated persons" without prior written approval by Principal Supervisory Agent of the FHLBB. In support of his contention that the violation of the regulation should be viewed as the

origin of the claim, Mitchell argues that his failure in his capacity as Chairman and Director of the Bank to obtain the necessary approval of the Supervisory Agent prior to the Bank's sale of the stock to the vice-presidents in compliance with § 563.41 was actually the "origin of the claim" and, as such, his restitution payment necessarily should be considered a business expense under § 162(a).

This argument fails to address the fact that it was Mitchell's *original* intent to personally acquire the stock from the beginning of the transaction. Beaver and Claggett were merely "straw-men" who were used solely for the intended purpose of preventing the Bank from losing its capital loss tax benefits from a direct sale of the stock to Mitchell.

Thus, the Tax Court was correct in determining the origin of the claim to be taxpayer's acquisition of the capital asset, and that his violation of FHLBB regulation was merely ancillary to the acquisition of Home and City stock for his own personal investment. To allow any other result would be to permit Mitchell to profit from his machinations that were designed solely to circumvent the law.

Petitioner's final argument is that the restitution payment cannot be categorized as a capital expenditure because the FHLBB lacked the authority to force the return of the shares. Mitchell contends that because a forced return of the shares is "specific performance", this remedy would have been unavailable because an adequate remedy existed at law. We find no merit in this argument.

The penalties that the FHLBB may impose for regulatory violations have been specifically enumerated in 12 U.S.C. § 1818(b)(6)(A)-(F). The FHLBB is statutorily empowered to force the violating party to:

(A) make restitution or provide reimbursement, indemnification, or guarantee against loss if —

(i) such depository institution or such party was unjustly enriched in connection with such violation or practice; or

(ii) the violation or practice involved a reckless disregard for the law or any applicable regulations . . .

\* \* \* \* \* \*

(C) *dispose of any* loan or *asset involved;*

(D) rescind agreements or contracts; and

\* \* \* \* \* \*

(F) *take such other action as the banking agency determines to be appropriate.*

12 U.S.C. § 1818(b)(6) (emphasis added).

Petitioner relies upon *di Stefano v. United States, Dept. of Treasury,* 787 F.Supp. 292 (D.R.I.1992) for the proposition that, in order for the FHLBB to be entitled to specific performance, there must be no other sufficient remedy at law. *di Stefano* does not support Petitioner's contention. In *di Stefano,* the petitioner sought a preliminary injunction to prevent implementation of the Office of Thrift Supervision's Temporary Order which had been issued pursuant to 12 U.S.C. § 1818. The Temporary Order required the petitioner, a bank officer, to return a $24,750 salary bonus which had been paid in violation of federal regulations. Not only did the court deny petitioner's motion finding that petitioner failed to prove the requisites for an injunction, but also the court explicitly acknowledged the OTS's authority to require specific performance in the return of the $24,750 pursuant to 12 U.S.C. § 1818(b)(6)(F).

Clearly, under the plain language of either subsections (C) or (F)—and possibly (D)—of § 1818(b)(6), the FHLBB would have been empowered to order the return of the Home and City shares. *See, CityFed Financial Corp. v. OTS,* 58 F.3d 738 (D.C.Cir.1995) and *Wachtel v. OTS,* 982 F.2d 581 (D.C.Cir.1993), holding that 12 U.S.C. 1818(b) empowers the requisite agencies to take the proper "affirmative action" as the agency sees fit within the statutory framework. Since the FHLBB would have had the authority to order return of the stock to the Bank, it acted well within its authority by ordering Mitchell to pay restitution as a substitute for the stock's return.

### III. *CONCLUSION*

For all of the foregoing reasons, the Court finds that the Tax Court correctly deter-

mined that Petitioner's payment of $755,172 as restitution for tax benefits lost by County Savings Bank is not deductible as an ordinary and necessary business expense under § 162 of the Internal Revenue Code. The payment was made to protect Petitioner's ownership of stock, thus it must be treated for tax purposes as a capital expenditure. Accordingly, the decision of the Tax Court is AFFIRMED.